

RECEIVED
IN MONROE, LA
AUG 2 9 2006
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

| | |
|---|---|
| **VICKY B. CHELETTE** | **CIVIL ACTION NO. 04-2440** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, ET AL.** | **MAG. JUDGE JAMES D. KIRK** |

## Ruling

This is an action brought by Plaintiffs Vicky B. Chelette and Dale Chelette

against Mrs. Chelette's former employer, State Farm Mutual Automobile Insurance Company

("State Farm") and against another State Farm entity, State Farm Fire and Casualty Company.

Mrs. Chelette alleges that she was subjected to sexual harassment in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*("Title VII") and the Louisiana Employment

Discrimination Law ("LEDL"), La. Rev. Stat. § 23:300, *et seq.*, and retaliation in violation of Title

VII. Mr. Chelette asserts a loss of consortium claim.

On June 9, 2006, State Farm filed a Motion for Summary Judgment [Doc. No. 58].

On July 5, 2006, Plaintiffs filed an opposition memorandum [Doc. No. 66].

On July 27, 2006, the Court granted State Farm leave to file its reply memorandum [Doc.

No. 80] in support of its Motion for Summary Judgment.

On August 10, 2006, Plaintiffs filed a sur-reply in opposition to State Farm's Motion for

Summary Judgment.

On August 21, 2006, the Court granted State Farm leave to file an amended reply

memorandum [Doc. No. 127] solely to correct inaccurate quotes from Mrs. Chelette's deposition.

For the following reasons, State Farm's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

## I. FACTS AND PROCEDURAL HISTORY

In August 1989, Mrs. Chelette was hired by State Farm to work in its accounting department. From the onset of her employment, Mrs. Chelette was familiar with State Farm's sexual harassment policies and knew that she could report harassment to her supervisor or human resources or by using State Farm's "1-800" hotline. She was also aware that State Farm had a policy prohibiting retaliation against individuals who reported harassment. She received State Farm's Code of Conduct on an annual basis and was aware that by signing that document she agreed to report immediately any perceived problems with the integrity of State Farm co-workers.

Mrs. Chelette worked in the accounting department in various positions until 1993. During that time, she received positive performance evaluations and salary increases. In 1993, she became an Agency Training Representative and continued to receive positive performance evaluations and salary increases in her new position.

In August 1999, Mrs. Chelette was selected to be an Agency Field Specialist ("AFS") Trainee, working in the Monroe Agency Field Office ("Monroe AFO"). Rex Finklea ("Finklea") was the Agency Field Consultant ("AFC") for the Monroe AFO, a superior classification to AFS. Finklea reported directly to Jeri Bradford ("Bradford"), the Agency Field Executive ("AFE") for the Monroe AFO.

In February 2000, Mrs. Chelette was promoted to AFS, and in November 2000, she was promoted to Senior Agency Field Specialist.

In May 2002, Mrs. Chelette received a performance rating of "L2De" or "Level 2, Developing."

2

Mrs. Chelettes contends that from the time she began her employment with the Monroe AFO, she was subjected to sexual harassment by Finklea, but that his inappropriate behavior increased in 2002. Mrs. Chelette contends that Finklea (1) brushed up against her with his arm an unknown number of times; (2) stood next to her and brushed his arm against her breast on an unknown number of times (perhaps more than ten); (3) rubbed or "massaged" her shoulders four or five times while she was sitting at her desk; (4) stared at her breasts; (5) sometime prior to 2002, commented that she was proportioned nicely and that her husband was lucky; (6) sometime a few months after late 2002 but before December 2003, made other comments about her body and how much he liked to watch her walk away; (7) commented on his lack of sex life and questioned Mrs. Chelette whether she had ever thought about having an affair; and (8) discussed how lucky Bradford's former husband, George Smith, was because he had several affairs with young college women.

In late 2002, Mrs. Chelette and Finklea returned to Monroe from a meeting at the office of Sellers Aycock, an agent in Rayville. According to Mrs. Chelette, once they arrived back in Monroe, Finklea turned to her while they were still in the vehicle and said, "I may go upstairs unless you'd like to go somewhere alone and get to know each other better." She alleges that he then leaned across the console of the car as if he wanted to kiss her. Mrs. Chelette states that she told Finklea she was not interested in getting to know him better that they knew each other well enough. After Mrs. Chelette declined Finklea's alleged proposition in late 2002, Finklea behaved appropriately for a "few months," but began behaving inappropriately again in 2003. Mrs. Chelette did not report Finklea's conduct.

In January 2003, Bradford retired, but was not immediately replaced. Finklea acted as AFE from Bradford's retirement until May or June 2003. At that time, Ken Daniel ("Daniel"), the AFE

3

for the Alexandria AFO, also began serving as interim AFE for the Monroe AFO. Daniel continued to reside in Alexandria.

In May 2003, Mrs. Chelette again received a Level 2, Developing performance rating.

In spring 2003, Finklea returned from a company trip to Hawaii with his wife. He brought gifts of macadamia nuts to two women, but gave Mrs. Chelette, who had a new swimming pool, a sheer swimsuit coverup.

In October 2003, Daniel learned that in January 2004 he would officially assume the role of AFE for the Monroe AFO, as well as continuing as AFE for the Alexandria AFO. At that time, he received Mrs. Chelette's employee shield (or personnel file) and found that she had done a "very commendable job."

In preparation for assuming the AFE role in Monroe, in October 2003, Daniel also spoke to all of the thirty-three agents serviced by that AFO to gauge their satisfaction.

Following Daniel's appointment as the AFE for the Monroe AFO, Finklea continued to have input into Mrs. Chelette's performance evaluations and salary increases and remained the highest ranking member of the Monroe AFO actually stationed in Monroe.

In November or December 2003[1], Mrs. Chelette and Finklea traveled to Baton Rouge for a meeting at the office of Tim McFadden ("McFadden"). When they were returning, Mrs. Chelette alleges that Finklea began to make comments about her body, ask about her relationship with her husband, and ask when her husband expected her home. When Finklea parked the vehicle at the Monroe Operations Center at approximately 6:30 or 7:00 P.M., Mrs. Chelette says that he again asked if she wanted to go somewhere alone to get to know each other better and again leaned

_____

[1]State Farm contends that this meeting took place on November 7, 2003. However, Mrs. Chelette contends that it occurred on December 3 or 4, 2003.

4

across the console of the car as if to kiss her. Mrs. Chelette says she again told him that she was not interested in a relationship, that they knew each other well enough, and that she had to pick up her children. She then exited the vehicle.

In the middle to latter part of December 2003, Mrs. Chelette traveled to Alexandria. She asked Daniel if she could speak with him about Finklea. Daniel told her that he did not have time that day, but would be in the Monroe office in the very near future and that they could speak at that time.

In January 2004, Daniel was in the Monroe office, and Mrs. Chelette reminded him that she wanted to speak with him about Finklea. He apologized and advised her that he did not have time to meet with her that day, but would return to Monroe in the near future.

In February 2004, Daniel returned to Monroe, but he and Mrs. Chelette did not meet because of his schedule. Daniel advised that he would return in 1-2 weeks and that they would definitely meet at that time.

On March 8, 2004, Daniel and Finklea met with Mrs. Chelette. Daniel explained to Mrs. Chelette that agents had raised specific concerns about her performance, including (1) failing to follow-up; (2) rescheduling appointments; (3) cutting training short; (4) scheduling too many things, so that some things were short-changed; (5) spending too much time discussing personal issues; (6) not being available when she was needed; (7) sometimes not returning telephone calls; (8) the perception that AFO was covering for her; and (9) not being well-versed in many issues. Mrs. Chelette admits that Daniel raised these concerns, but denies that they were true and denies that she was aware of any dissatisfaction with her performance prior to this meeting.

During the meeting, Mrs. Chelette asked to speak with Daniel alone. Daniel did not allow Finklea to leave while they were discussing the performance issues. However, at some point,

5

Finklea left the meeting. Mrs. Chelette then informed Daniel for the first time that Finklea made advances toward her on two occasions while they were traveling to and from meetings together. She told Daniel that she wanted someone within State Farm to tell Finklea not to do these things again and this would be an adequate resolution to the situation.

Mrs. Chelette had not previously reported Finklea's behavior to Bradford, Daniel, or Human Resources, and she had never called State Farm's "1-800" hotline.

Mrs. Chelette admits that Finklea did not engage in any behavior of which she previously complained following the trip to Baton Rouge.[2]

After the March 8, 2004 meeting and prior to reporting Mrs. Chelette's complaints to anyone else, Daniel had dinner with Finklea, advised him of Mrs. Chelette's allegations, and told Finklea that he believed he would be cleared of the charges.

By March 10, 2004, Daniel contacted Scott Blackford ("Blackford"), the Human Resources Manager, about Mrs. Chelette's complaints against Finklea.

On March 12, 2004, Blackford asked Leisha Willis ("Willis"), a Human Resources Representative, to investigate Mrs. Chelette's complaint.

On March 15, 2004, Willis left a message for Mrs. Chelette asking to meet with her in person. Mrs. Chelette returned the call on March 16, 2004, and told Willis that she was out of town, but could meet on Friday, March 19, 2004.

On March 19, 2004, Willis and Connie Smith ("Smith), another Human Resources employee, met with Mrs. Chelette to discuss Finklea. Mrs. Chelette asked Willis to have Daniel

---

[2]Although Mrs. Chelette contends that Finklea behaved inappropriately after this time, her allegations relate to his failure to follow State Farm's instruction that the two of them not be in a car alone and his alleged retaliation against her, not the types of alleged harassment she described as occurring between 1999 and December 2003.

6

talk with Finklea about her claims, tell Finklea that he made her uncomfortable, and tell Finklea that she did not want to ride alone in a car with him.

Willis related Mrs. Chelette's requests to Daniel. Daniel then spoke with Finklea. Finklea agreed to he did not want to be alone with Mrs. Chelette if possible. After March 2004, Finklea and Mrs. Chelette were not alone together.

On March 22, 2004, Daniel stated in an e-mail that he was recommending that Mrs. Chelette receive a "needs improvement" rating with a 1 % increase.

Daniel did not meet with Mrs. Chelette again between March 29, 2004, and April 20, 2004.

On April 20, 2004, Mrs. Chelette began to experience a migraine headache, which caused her to throw up and begin losing vision in one eye. Mrs. Chelette, Kathy McDuffie ("McDuffie"), and Finklea were the only persons at the AFO that day. McDuffie offered to give her a ride to the doctor's office, but when she told Finklea the situation, he said that he would drive Mrs. Chelette to the doctor. Finklea was leaving the office that day at noon to prepare for a trip. In the meantime, Mrs. Chelette was able to contact her husband, who picked her up and took her to the doctor.

Mrs. Chelette found Finklea's offer upsetting because they would have been in a car alone together. Mrs. Chelette did not complain to anyone at State Farm about this incident at the time. She took a medical leave of absence and never returned to work after April 20, 2004.

On May 8, 2004, Mrs. Chelette received a rating of "Level 1, Developing," resulting in a 2% merit increase. Daniel testifies that he made the decision to recommend Mrs. Chelette for this rating prior to the March 8, 2004 meeting, with input from Finklea, and that this rating is the same as Level 1, Needs Improvement under the old rating system.

On May 28, 2004, Mrs. Chelette made Willis aware of the April 20, 2004 offer by Finklea

7

to take her to the doctor, but no investigation was conducted.

On June 10, 2004, Mrs. Chelette's Series Six Securities license was terminated. All registered representatives who are sponsored by State Farm with the National Association of Securities Dealers ("NASD") are required to complete continuing education on an annual basis. Representatives are required to attend one of several annual meetings held by State Farm in April, May, and June. If a representative fails to attend one of the annual meetings, he or she is placed in U-5 status, meaning that State Farm is not sponsoring his or her registration with NASD, and the individual cannot deal in securities until his or her sponsorship is reinstated.

By June 2004, Mrs. Chelette had not attended an annual meeting and was out on medical leave with no anticipated date of return. Jim Vanderveen ("Vanderveen"), the Central Zone Compliance Coordinator for State Farm, advised Daniel that the proper procedure was to request U-5 status because State Farm could not ensure that she would complete her mandatory continuing education requirements timely. If State Farm fails to request U-5 status timely, then NASD can fine the company. At the time of his recommendation to Daniel, Vanderveen, who is located in Illinois, was unaware of Mrs. Chelette's sexual harassment complaint and knew only that she was on a medical leave of absence.

Although Mrs. Chelette's license was placed in U-5 status, she could have applied within two years through a sponsor employer to have the license reinstated if she became current with her continuing education requirements. Mrs. Chelette would have to go through a background check, but she would not have had to retake the securities examination.

Mrs. Chelette was notified by correspondence dated June 17, 2004, of the termination of her license. She could not perform her job as a Senior Agency Field Specialist for State Farm without her license.

8

On June 21, 2004, Mrs. Chelette, Willis, and Daniel had a conference call during which the April 20, 2004 incident and other issues were discussed.

On October 13, 2004, Mrs. Chelette's attorney faxed a written charge of discrimination, verified by Mrs. Chelette under oath, to the EEOC, but it was not on the EEOC's form.

On November 12, 2004, Plaintiffs filed this lawsuit in the Fourth Judicial District Court, Parish of Ouachita, State of Louisiana, asserting state law claims of sexual harassment, retaliation, and loss of consortium, but reserving their right to amend to add federal claims once the EEOC completed its investigation.

On December 2, 2004, State Farm removed the case to this Court.

On December 17, 2004, the EEOC summarized Mrs. Chelette's charge on its form, using the information provided in her October 13, 2004 letter. Mrs. Chelette signed and verified the form on February 14, 2005.

On March 9, 2005, State Farm formally terminated Mrs. Chelette's employment because all available illness benefits had expired, and she had not returned to her former position or applied for or obtained an alternative position. Mrs. Chelette received all leave due to her.

On March 31, 2005, Mrs. Chelette sent a revised charge form to the EEOC.

On April 20, 2005, the EEOC issued a Dismissal and Notice of Rights on the basis that Mrs. Chelette had already filed a lawsuit.

On May 5, 2005, the Court granted Plaintiffs leave to file a First Supplemental and/or Amended Complaint ("Amended Complaint"). Plaintiffs incorporated by reference their original Petition, but added sexual harassment and retaliation claims under Title VII and a request for attorneys' fees.

9

## II.    LAW AND ANALYSIS

### A.    Motions for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.* The moving party cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case. *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

### B.    Claims Against State Farm Fire and Casualty Company

State Farm moves for summary judgment on the claims against State Farm Fire and

10

Casualty Company. Mrs. Chelette admits that she was not employed by State Farm Fire and

Casualty Company, Plaintiffs consent to its dismissal. *See* [Doc. No. 69] and [Doc. No. 107, p. 6].

Accordingly, State Farm's Motion for Summary Judgment is GRANTED, and the claims against

State Farm Fire and Casualty Company are DISMISSED WITH PREJUDICE.

## C.     Mrs. Chelette's Hostile Work Environment Claims[3] under Title VII and State Law

Title VII's prohibition against discrimination in the terms, conditions, or privileges of

employment has been interpreted by the courts to provide a cause of action to an individual who

suffers a discriminatorily hostile environment or workplace harassment. *See Harris v. Forklift*

*Sys., Inc.*, 510 U.S. 17, 20 (1993).

Louisiana courts have also recognized a cause of action for sexual harassment under the

anti-discrimination laws. *See Brooks v. Southern Univ. and Agric. and Mech. Coll.*, 877 So.2d

1194, 1219 (La. App. 4 Cir. 2004) ("The plaintiff's sexual harassment claim falls within the ambit

of [Louisiana anti-discrimination law], which prohibits intentional discrimination on the basis of

race, color, religion, sex or national origin.").

### 1.     Timeliness of Mrs. Chelette's Claims

State Farm moves for summary judgment on Mrs. Chelette's federal and state sexual

harassment claims on the basis that they are time-barred.

#### a.     State Law Claim

Under the LEDL, harassment claims are subject to a one-year prescriptive period which

---

[3]Mrs. Chelette contends only that she suffered severe or pervasive sexual harassment sufficient to hold State Farm liable under a hostile work environment theory of recovery. She does not contend that she was subjected to "quid pro quo" harassment by Finklea where she suffered a tangible employment action as a result of her rejection of his alleged advances. *See Casiano v. AT & T Corp.*, 213 F.3d 278, 283-84 (5th Cir. 2000).

11

commences from the date of the last harassing act. *Bustamento v. Tucker*, 607 So.2d 532 (La. 1992). "However, this one-year period shall be suspended during the pendency of any administrative review or investigation of the claim conducted by the federal [EEOC] or the Louisiana Commission on Human Rights. No suspension . . . shall last longer than six months." La. Rev. Stat. 23:303(D).

State Farm contends that Mrs. Chelette's sexual harassment claim is untimely under state law. According to State Farm, the last act of alleged harassment occurred on November 7, 2003, on the date that Mrs. Chelette and Finklea attended a meeting at McFadden's office in Baton Rouge. Mrs. Chelette's lawsuit was not filed until November 12, 2004, more than one year later. Acknowledging that the prescriptive period is suspended by an EEOC investigation, State Farm argues that Plaintiffs are not entitled to the benefit of the suspension because Mrs. Chelette did not file a charge of discrimination until December 17, 2004, after her lawsuit was filed.

Mrs. Chelette has presented affidavit and deposition testimony that the trip to Baton Rouge did not take place until December 3 or 4, 2003, less than one year before her lawsuit was filed.

Under these circumstances, the Court finds that Mrs. Chelette has raised a genuine issue of material fact as to the date of the Baton Rouge meeting and, thus, when the last act of alleged harassment occurred.[4] Viewing the evidence in the light most favorable to the non-movants, Plaintiffs' lawsuit was timely filed on November 12, 2004.

Moreover, even if a jury found that the Baton Rouge meeting took place on November 7,

---

[4]While State Farm argues that there is no "genuine" issue of material fact as to the date of the last meeting, to accept its argument, the Court would have to engage in a credibility determination, accepting the testimony of Finklea and McFadden over that of Mrs. Chelette. Such credibility determinations are not appropriate at the summary judgment stage, particularly where, as here, Finklea did not contest the date of the meeting until after his deposition.

12

2003, the time for filing the lawsuit was suspended on October 13, 2004, when Mrs. Chelette submitted a verified letter complaint of discrimination to the EEOC by fax. [Doc. No. 66, Exh. 42]. While that complaint was not prepared on the proper EEOC form, it is far more detailed than the summary form that was prepared by the EEOC on December 17, 2004, is signed under oath by Mrs. Chelette, and contains all the information necessary for a charge of discrimination. Thus, the October 13, 2004 letter was sufficient to trigger an EEOC investigation or review of her claims[5] and invoke the six-month suspension of the prescriptive period under La. Rev. Stat. 23:303(D). Plaintiffs' lawsuit was filed only one month later and is timely.

Accordingly, State Farm's Motion for Summary Judgment on Mrs. Chelette's state law claim of sexual harassment as untimely is DENIED.

### b.    Title VII Claim

State Farm also contends that Mrs. Chelette failed to timely exhaust her administrative remedies under Title VII. In a state, such as Louisiana, which has a human rights agency to

---

[5]Although the Court could find no cases directly on point, nor have the parties cited the Court to any authority on this issue, the statute does not speak to the time that the plaintiff's allegations were summarized on an EEOC charge form, nor to when the charge was verified, but to the "pendency" of an investigation or review. Thus, to the extent that the written complaint submitted by Mrs. Chelette's attorney was not on the proper form and may not have been officially "filed," the Court believes that it was a "charge" of discrimination sufficient to trigger an investigation or review, particularly where, as in this case, it was signed under oath. *See E.E.O.C. v. I-Sector Corp.*, 2003 WL 29939 (N.D. Tex. Jan. 2, 2003) (Plaintiff's detailed letter was a "charge" within the meaning of EEOC regulations set forth at 29 C.F.R. § 1601.12); *cf. Broadus v. Aegis Commc'n Group Inc.*, 2002 WL 1371214 (N.D. Tex. June 20, 2002) (Plaintiff's unsigned letters addressed to defendant were insufficient to serve as EEOC charges when they mentioned perceived "nepotism, unfairness, and possibly discrimination," but failed to name specific parties, allege specific acts of discrimination, and there is no evidence that these letters were ever received by the EEOC); *see also Edelman v. Lynchburg Coll.*, 535 U.S. 106, 115 (2002) ("A complaint to the EEOC starts the agency down the road to investigation, conciliation, and enforcement.").

13

investigate unlawful employment practices, an employee must file a charge of discrimination within 300 days of the last act of alleged harassment. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

State Farm argues that Mrs. Chelette did not file a charge of discrimination until the date on the EEOC form, December 17, 2004, and that no act of harassment occurred within the 300-day time period prior to that date.

Mrs. Chelette argues that she submitted a charge to the EEOC on October 13, 2004, and that Finklea committed an act of harassment within 300 days prior to her charge. She relies on his April 20, 2004 offer to drive her to the doctor because he "breached the directive to refrain from being alone with Mrs. Chelette in a car." [Doc. No. 66, p. 25]. Thus, Mrs. Chelette contends that her EEOC charge was timely filed.

Even if the Court uses the earliest date of filing suggested by Mrs. Chelette, an act of harassment must have occurred between December 18, 2003, and October 13, 2004. In this case, the last act of harassment could not have occurred any later than December 4, 2003, when Finklea allegedly made inappropriate comments and propositioned Mrs. Chelette on their return from a trip to Baton Rouge. Although Mrs. Chelette is correct that the act of harassment does not have to be a "sexual advance," *see* [Doc. No. 66, p. 25 n.43], she must still show that "an act contributing to [the] hostile environment [took] place within the statutory time period." *Morgan*, 536 U.S. at 105; *see also id.* at 117 ("Provided that an act **contributing to the claim** occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.") (emphasis added). The act suggested by Mrs. Chelette, that Finklea offered to take her to the doctor when she was suffering from a migraine headache, vomiting, and loss of vision, is not an act contributing to the hostile environment, even in the face of a directive from

14

State Farm that he and she were no longer to be in a car alone together. Finklea and Mrs. Chelette were never in the car together because her husband drove her to the doctor himself.

Additionally, because State Farm had intervened by conducting an investigation and resolving Mrs. Chelette's complaints in the manner she wished, Finklea's offer to drive Mrs. Chelette to the doctor is not part of the same hostile environment claim. *Id.* at 118 (Explaining that if an action within the statutory period "had no relation to [earlier] acts . . . , or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts.").[6]

Mrs. Chelette admits that Finklea did not engage in any other behavior she considered inappropriate after December 2003. Therefore, she failed to timely exhaust her administrative remedies with regard to her sexual harassment claim under Title VII.

State Farm's Motion for Summary Judgment on Mrs. Chelette's claim of sexual harassment under Title VII is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

## 2. Prima Facie Case

Although Mrs. Chelette's sexual harassment claim under Title VII has been dismissed, the Court must analyze her sexual harassment claim under the LEDL. Louisiana courts routinely review state law claims of discrimination and harassment following the analysis set forth in federal Title VII cases because of the similarity of the two statutes. *See Hailey v. Hickingbottom*, 30,728 (La. App.2d Cir.6/24/98), 715 So.2d 647, 650-51 ("Both statutes contain similar language tracking

---

[6]The Court reads the Supreme Court's decision in *Morgan* to suggest that, in certain cases, a plaintiff might be able to recover for a single act of harassment within the statutory period, but because of an employer's intervention or because the act is not sufficiently related to earlier acts, the continuing violation theory would not apply. In this case, however, the Court notes that Finklea's April 20, 2004 offer of a ride to Mrs. Chelette is an insufficient basis, standing alone, for a claim of sexual harassment under Title VII.

15

the language of Title VII of the federal law under which sexual harassment claims have been recognized as a form of discrimination based upon sex."); *see also Spears v. Rountree Oldsmobile-Cadillac Co.*, 26,810 (La. App. 2d Cir.4/5/95), 653 So.2d 182.

The plaintiff in a hostile work environment claim must establish that (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action. *See Green v. Administrators of the Tulane Educ. Fund*, 284 F.3d 642, 655 (5th Cir. 2002); *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 298-99 (5th Cir. 2001); *see also Frank v. Xerox Corp.*, 347 F.3d 130 (5th Cir. 2003). If the "the harassment is allegedly committed by a supervisor with immediate (or successively higher) authority over the harassment victim," then the plaintiff need not establish the fifth element. *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353-54 (5th Cir. 2001). For purposes of summary judgment only, State Farm does not contest that Finklea served as Mrs. Chelette's supervisor. Therefore, she need only show the first four elements.

Conduct sufficient to create a hostile working environment must be severe or pervasive. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998). A plaintiff "must subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable." *Frank*, 347 F.3d at 138 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)). Whether an environment is objectively hostile or abusive depends on the totality of the circumstances, including factors such as the frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 21-22. A "recurring point in [Supreme Court] opinions is that simple teasing, offhand comments, and

16

isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (internal quotes omitted).

In this case, State Farm contends that Mrs. Chelette has not alleged conduct so severe or pervasive as to affect a term, condition, or privilege of employment. Mrs. Chelette points to the following instances of alleged harassment by Finklea:

- During the five years they worked together, Finklea brushed up against her with his arm an unknown number of times.

- During the five years they worked together, Finklea stood next to her and brushed his arm against her breast on some unknown number of times (perhaps more than ten).

- During the five years they worked together, Finklea rubbed or "massaged" her shoulders four or five times while she was sitting at her desk.

- During the five years they worked together, Finklea stared at her breasts.

- Sometime prior to 2002, Finklea commented that she was proportioned nicely and that her husband was lucky.

- Sometime a few months after late 2002 but before December 2003, Finklea made other comments about her body and how much he liked to watch her walk away.

- Finklea commented on his lack of sex life and questioned Mrs. Chelette whether she had ever thought about having an affair.

- Finklea commented that the former husband of her supervisor, Bradford, was lucky because he had several affairs with young college women.

- In late 2002, after they returned from a business meeting in Rayville and were still in the vehicle together, Finklea said, "I may go upstairs unless you'd like to go somewhere alone and get to know each other better" and leaned across the console of the car as if he wanted to kiss her.

- In spring 2003, Finklea returned from a company trip to Hawaii with his wife and brought Mrs. Chelette a sheer swimsuit coverup as a gift.

17

•     In November or December 2003, as they were driving back from a business meeting in Baton Rouge, Finklea began to make comments on her body, ask about her relationship with her husband, and ask when her husband expected her home. Once they returned to Monroe, but when they were still in the vehicle together, he again said that he wanted to get to know each other better and again leaned across the console of the car as if he wanted to kiss her.

Under the controlling case law in the Fifth Circuit, these allegations simply do not rise to

the level of severe or pervasive conduct required for recovery.[7] *See, e.g., Shepherd v.*

*Comptroller of Pub. Accounts,* 168 F.3d 871 (5th Cir. 1999)(co-worker's actions over a two-year

period were insufficient to create a hostile work environment, although he commented that

plaintiff's elbows were the same color as her nipples, commented on the size of plaintiff's thighs

while pretending to look under her dress, rubbed plaintiff's arm from shoulder to wrist on several

occasions, patted his lap and said, "here's your seat" on two occasions, and attempted to look

down plaintiff's clothing on several occasions); *Hockman v. Westward Commc'ns, LLC,* 407

F.3d 317, 326 (5th Cir. 2004) (plaintiff's claims that the alleged harasser (1) once made a remark

to her about another employee's body, (2) once slapped her on the behind with a newspaper, (3)

"grabbed or brushed" against her breasts and behind, (4) once held her cheeks and tried to kiss

her, (5) asked her to come to the office early so that they could be alone, and (6) once stood in the

door of the bathroom while she was washing her hands were "perhaps even less egregious than

---

[7]Many of the alleged acts of harassment occurred outside the prescriptive period. However, as previously noted, state courts generally apply Title VII analysis to state law claims of discrimination and harassment, including the continuing violation theory. *See Alcorn v. City of Baton Rouge,* 898 So.2d 385 (La. App. 1 Cir. 12/30/04) (Applying a continuing violations analysis to plaintiff's claims of racial harassment). Although this case is unusual because Mrs. Chelette's Title VII sexual harassment claim is time-barred while her state law claim is timely, the Court concludes that the continuing violation theory remains applicable.

18

that alleged in *Shepherd*," and, "[a]t best, . . . are on the same plane as those in *Shepherd*.); *cf. Harvill v. Westward Commc'ns L.L.C.*, 433 F.3d 428 (5th Cir. 2005) (Fact issues existed as to whether co-worker's conduct was severe or pervasive when, during a seven-month period, he made comments about the plaintiff's sex life and abilities in bed, grabbed the plaintiff and kissed her on the cheek, popped rubber bands at her breasts, fondled her breasts and/or patted her on her buttocks perhaps as often as once a week, and came behind her and rubbed his body against her); *McKinnis v. Crescent Guardian, Inc.*, No. 05-30728, 2006 WL 1880364 (5th Cir. July 7, 2006) (Plaintiff's allegations were more like *Harvill* than *Shepherd* and thus raised a genuine issue of fact for trial where she testified that during a two-month period, her supervisor "was harrassing [sic] me; he kept coming in the post where I was; asking me for hugs and kisses," touching her on the breast and thigh and getting other co-workers to retaliate against her). In this case, while Finklea's behavior, if true, was boorish and offensive, it was not sufficient to create a hostile, abusive work environment. These simply were not the types of intimate touchings found in *Harvill* and *McKinnis*, and Mrs. Chelette has failed to make out a prima facie case of sexual harassment.

### 3. The *Faragher/Ellerth* Defense

In the alternative, even if Mrs. Chelette's allegations were sufficient to raise a genuine issue of material fact whether she suffered a hostile work environment, State Farm is entitled to the affirmative defense recognized in the Supreme Court decisions of *Ellerth*, 524 U.S. 742 , and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

An employer is vicariously liable for a supervisor's sexual harassment behavior where a tangible employment action is taken against the victim-employee by the harassing supervisor.

19

*Faragher*, 524 U.S. at 807. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

Where there is no tangible employment action, however, the employer may avoid liability by raising a two-pronged affirmative defense: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

The case law suggests that an employer may satisfy the first prong by demonstrating that it had an anti-harassment policy which it promulgated to employees and properly implemented and that, if an employee makes a complaint under that policy, the employer conducts a prompt investigation. *See Williams v. Admin. Review Bd.*, 376 F.3d 471, 478-79 (5th Cir. 2004); *Wyatt v. Hunt Plywood Co, Inc.*, 297 F.3d 405, 410, 413 (5th Cir. 2002). Any remedial steps taken by the employer "must be 'reasonably calculated' to end the harassment." *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 615 (5th Cir.1999)(quoting *Jones v. Flagship Int'l*, 793 F.2d 714, 719-20 (5th Cir.1986)). "What constitutes prompt remedial action depends on the facts of the case, and 'not every response by an employer will be sufficient to discharge its legal duty.'" *Id.* at 615 (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 479 (5th Cir.1989)).

As to the second prong, *Faragher* instructs that "[i]f the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if the damages could reasonably have been mitigated, no award against a liable employer should

reward a plaintiff for what her own efforts could have avoided." 524 U.S. at 807.

### a. Tangible Employment Action

Mrs. Chelette contends that the *Faragher/Ellerth* defense is not available to State Farm because she suffered a tangible employment action in the form of a negative performance review. In May 2004, Mrs. Chelette received a rating of "Level 1, Developing," resulting in a 2% merit increase.

State Farm responds that a negative performance review is not the type of tangible employment action that precludes the application of the *Faragher/Ellerth* defense.

The Court agrees with State Farm that Mrs. Chelette's performance review and resulting 2% merit increase are not tangible employment actions.[8] *See Thompson v. Naphcare, Inc.*, 117 Fed. Appx. 317, 2004 WL 2554866 at *4 (5th Cir. Nov. 11, 2004) ("The purpose of Title VII is to remedy ultimate employment decisions, not to challenge every interim action taken by an employer that may have a tangential effect on an ultimate decision."). While Mrs. Chelette may not have received the increase in salary she may have wished, she did not suffer a significant change in benefits or any diminution in her compensation.[9] Thus, State Farm is not strictly liable

---

[8]The Court also notes that the position taken by Mrs. Chelette with regard to the *Faragher/Ellerth* defense is inconsistent with its characterization of her sexual harassment claim as one under a theory of hostile work environment, rather than *quid pro quo*.

[9]In unpublished decisions, the Fifth Circuit has interpreted *Faragher/Ellerth 's* "tangible employment action" to mean an "ultimate employment decision." *See Harper v. City of Jackson Mun. Sch. Dist.*, 149 Fed. Appx. 295, 2005 WL 2404813 at *4 (5th Cir. Sept. 30, 2005); *Thompson*, 2004 WL 2554866 at *4. While these opinions are not binding on the Court, they may constitute persuasive precedent. 5th Cir. R. 47.5.4. However, whether or not the Fifth Circuit's "ultimate employment decision" test is a correct interpretation of *Faragher/Ellerth 's* tangible employment action, the Court would still find that Mrs. Chelette's performance review and lesser increase in salary is not the type of tangible employment action contemplated by the Supreme Court. *Cf. Ellerth,* 524 U.S. at 761 (A tangible employment action would include the

21

for Finklea's alleged harassment of Mrs. Chelette.

## b.  Application of *Faragher/Ellerth* Test

Having found that Mrs. Chelette did not suffer a tangible employment action, the Court now considers the applicable facts to determine if State Farm is entitled to the *Faragher/Ellerth* defense.

Mrs. Chelette was familiar with State Farm's sexual harassment policies and knew that she could report harassment to her supervisor, human resources, or using State Farm's "1-800" hotline. She was aware that State Farm had a policy prohibiting retaliation against someone who reported harassment. She also received State Farm's Code of Conduct on an annual basis and was aware that by signing that document she agreed to report immediately any perceived problems with the integrity of State Farm co-workers.

However, she did not report Finklea's alleged conduct until March 8, 2004, almost five years after the harassment allegedly began and approximately two years after it allegedly escalated. Mrs. Chelette contends that she was complying with State Farm policy by attempting to resolve the situation herself and that she attempted to talk with Daniel well before March 2004. However, if Finklea's conduct had escalated, then her efforts to resolve the situation were not working, and it was unreasonable for her to fail to report his conduct. Yet, she did not even attempt to report his conduct to anyone until December 2003.

When Mrs. Chelette did report Finklea's behavior, State Farm immediately took action. Daniel reported her allegations to Human Resources, and Blackford assigned Willis to investigate.

---

"**denial of a raise** or a promotion." (emphasis added).

22

Willis contacted Mrs. Chelette, set up a personal interview, and Willis and another Human Resources employee met with Mrs. Chelette. Willis conducted an investigation and resolved the situation in the specific manner that Mrs. Chelette requested. Mrs. Chelette admits that Finklea did not engage in any inappropriate conduct after December 2003, other than his offer to take her to the doctor's office on the last day she worked, April 20, 2004.

Under these circumstances, the Court finds that State Farm has established both prongs of the *Faragher/Ellerth* defense. State Farm had appropriate anti-harassment polices in place, Mrs. Chelette knew of those policies, and was aware that she could report Finklea's behavior to her supervisor (Bradford until January 2003) or to Human Resources or by using State Farm's 1-800 line. When she finally reported the alleged harassment five years after it began, State Farm promptly investigated and resolved her complaint in the manner she indicated that she would be comfortable with.

Additionally, the fact that Finklea may have violated the remedy she proposed, and State Farm directed, by offering to drive her to the doctor does not bar the application of the *Faragher/Ellerth* defense. The remedy must be "reasonably calculated" to end the harassment, and, in this case, the Court finds that, as a matter of law, it was.

Even if Mrs. Chelette could establish that she suffered severe or pervasive sexual harassment, State Farm has established that it is entitled to application of the *Ellerth/Faragher* affirmative defense, and its Motion for Summary Judgment is GRANTED.

## C. Mrs. Chelette's Retaliation Claims Under Title VII and State Law

Mrs. Chelette also asserts that State Farm unlawfully discharged her in retaliation for

23

making complaints of harassment and discrimination, in violation of Title VII[10] and state law.

### 1. Title VII

Section 704(a) sets forth Title VII's anti-retaliation provision as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Prior to June 2006, the Fifth Circuit required a plaintiff to show that (1) she engaged in activity protected by Title VII; (2) the employer took adverse employment action against her; and (3) a causal connection exists between that protected activity and the adverse employment action. *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705 (5th Cir. 1997). In the context of a retaliation claim, a plaintiff could meet her showing of an adverse employment action only if she suffered an "ultimate employment decision[]," including "acts 'such as hiring, granting leave, discharging, promoting, and compensation.'" *Id.* at 707 (quoting *Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir.1995)).

However, in *Burlington N. and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, --U.S.-- (2006), the Supreme Court recently examined this Section and rejected the Fifth Circuit's requirement that an employee suffered an ultimate employment action. *See id.* at 2410 (citing *Mattern*, 104 F.3d at 707). Instead, the Supreme Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

---

[10]State Farm does not challenge the timeliness of Mrs. Chelette's retaliation claim under Title VII.

*Id.* at 2415 (internal quotation marks omitted) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1217-1218 (D.C. Cir. 2006) (other quotation omitted)).

The Court further explained its test. By using the terms "material adversity," the Court intends to "separate significant from trivial harms," reaffirming its oft-quoted admonition that Title VII is not "'a general civility code for the American workplace.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80(1998)). The Court phrased "the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* Because "[c]ontext matters," the reviewing court must consider how a given acts affects a particular worker under all the circumstances. *Id.* (Giving the example that a schedule change might "make little difference to many workers, but may matter enormously to a young mother with school age children."). "By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, [the Court believes] this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.* at 2416.

Thus, a plaintiff must still show that she was engaged in protected activity, *see id.* at 2410, but now must show that she suffered a materially adverse action which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." She is still required to establish a causal connection between the participation in the protected activity and the adverse employment action, i.e, that the employer was motivated by a desire to retaliate. *Shackleford v. Deloitte & Touch, LLP*, 190 F.3d 398, 407-408 (5th Cir. 1999); *see also Burlington Northern*, 126 S.Ct. at 2416. The causal link required by the third prong of the prima facie case does not rise to the level of a "but for" standard. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (citation

25

omitted).

If the plaintiff is able to establish her prima facie case, then the burden of production shifts to the defendant to demonstrate a legitimate non-retaliatory purpose for the employment action. *Id.* (citation omitted).

Finally, if the defendant satisfies its burden of production, the plaintiff must prove that the employer's stated reason for the adverse action was merely a pretext for the real, retaliatory purpose. *Id.*

### a. Prima Facie Case

In this case, there is no dispute that Mrs. Chelette engaged in protected activity by making complaints of sexual harassment. However, State Farm contends that Mrs. Chelette did not suffer materially adverse actions under the Supreme Court's new standard, and that she cannot show a causal connection between any materially adverse action and her complaints of harassment. At issue are whether State Farm retaliated against Mrs. Chelette by (1) giving her an unfair and negative performance evaluation and resulting lower salary increase than she had received in the past and (2) terminating her NASD securities registration.

First, under the Supreme Court's new standard, the Court finds that the actions taken by State Farm are sufficient to be "materially adverse." The negative performance review resulted in a much lower merit increase than Mrs. Chelette had received in years past, and the loss of her securities license prevented Mrs. Chelette from returning to work in the position she held with State Farm.

Second, the Court concludes that Plaintiffs have established a prima facie case for retaliation by demonstrating a causal connection between her complaint of sexual harassment and

these two actions. The standard for establishing the "causal link" element of the plaintiff's prima facie case is much less stringent than the "but for" standard. *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996). The Supreme Court has found that temporal proximity may be sufficient when the timing between the protected activity and adverse employment action is "very close." *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Although State Farm contends that Daniel had already made a determination on the performance evaluation for Mrs. Chelette prior to learning of her allegations of sexual harassment at the March 8, 2004 meeting, there is at least a genuine issue of material fact whether the level was truly determined after the meeting. Considering these fact issues coupled with Daniel's friendship with Finklea and Mrs. Chelette's history of much higher performance reviews in all prior years, the Court finds that Mrs. Chelette has raised a genuine issue of material fact on the causal connection between her performance review and her allegations of sexual harassment.

Similarly, the Court finds that Plaintiffs have raised a genuine issue of material fact whether Daniel recommended the termination of Mrs. Chelette's security license because of her complaints of sexual harassment against Finklea. Although State Farm has produced evidence that Mrs. Chelette's securities license was not terminated until June 10, 2004, after she had been on a leave of absence for three months and had no anticipated date of return, the U-5 form produced by State Farm is dated May 10, 2004, only three weeks after she began a leave of absence.

Given the close temporal proximity of these actions and the other evidence produced by Mrs. Chelette, the Court finds that she has met her prima facie burden on the causal connection element, and the burden shifts to State Farm to produce legitimate, non-retaliatory reasons for these actions.

27

### b. Burden of Production

With regard to the performance evaluation, State Farm has produced evidence that it had received complaints from the agents she serviced. Specifically, State Farm has produced deposition testimony supporting its contention that, prior to the March 8, 2004 meeting, Daniel had personally spoken with Agents Pam Accardo, Blake Wheelis[11], and Paulen Luttgeharm, all of whom raised complaints about Mrs. Chelette's performance, such as failing to keep appointments at their offices or showing up when she was not scheduled to be there; being unreachable and not returning phone calls on a timely basis; not being helpful to the agent's staff; and socializing, rather than focusing on work.

With regard to the termination of Mrs. Chelette's securities license, State Farm has produced evidence that Mrs. Chelette failed to complete a continuing education course in April, May, or June of that year, a requirement for all persons State Farm sponsored for registration with NASD. Under these circumstances, Vanderveen, the Central Zone Compliance Coordinator for State Farm, who was located in Bloomington, Illinois, and did not know about Mrs. Chelette's claims of sexual harassment, advised Daniel to request NASD to place her license in U-5 status. In this status, Mrs. Chelette could have applied for reinstatement within two years if she was sponsored by an employer, met her continuing education requirements, and went through a background check.[12]

---

[11]Wheelis testified that he first spoke with Finklea in December 2003 about Mrs. Chelette's performance, but later had a conversation with Daniel as well.

[12]Plaintiffs contend that by terminating her securities license, State Farm was required to terminate Mrs. Chelette because she could not work in her previous position. However, Mrs. Chelette does not dispute that she was not terminated until she had exhausted all of the leave available to her, had not returned to work, and had not attempted to meet the requirements for reinstating her license.

28

The Court concludes that State Farm has met its burden of production, and Plaintiffs are required to present evidence to establish pretext for retaliation.

        **c.**    **Pretext**

Mrs. Chelette contends that State Farm's reasons for giving Mrs. Chelette a negative performance review and for terminating her securities license are not credible.

The Court finds that the evidence presented by Mrs. Chelette creates a genuine issue of material fact on the negative performance evaluation, but not the termination of her securities license. At no time prior to March 8, 2004, had Mrs. Chelette been counseled for performance issues. Although Daniel testifies that he had spoken with agents who expressed dissatisfaction with Mrs. Chelette's performance in October 2003, he did not meet with Mrs. Chelette or discuss these issues with her for five (5) months. In later testimony, he now states that he spoke with agents through February 2004. Of the agents Daniel cites as complaining about Mrs. Chelette, one denies that she ever complained. Mrs. Chelette received at least some indication from one of the complaining agents and from Daniel that her performance was more than acceptable during the 2003-2004 year.

During this same time period, Mrs. Chelette asked on several occasions to meet with Daniel about Finklea, but he did not meet with her. Although Daniel claims he did raise performance issues with Mrs. Chelette in February 2004, Mrs. Chelette denies that the meeting took place. There is no documentation of the meeting, and Finklea testified that his February 23, 2004 e-mail was in response to Daniel's request for input for what Daniel "was **going to** visit with [Mrs. Chelette] about."

When Daniel and Mrs. Chelette finally met in March 2004, and, in Mrs. Chelette's belief,

at her request, Daniel was not alone. He and Finklea both met with Mrs. Chelette, and Daniel raised her performance issues for the first time. Mrs. Chelette allegedly asked Daniel several times for Finklea to leave the room, so that she and Daniel could speak privately, but he would not immediately allow Finklea to leave.

Following the meeting, instead of reporting Mrs. Chelette's complaints to Human Resources, Daniel had dinner with Finklea, breached Mrs. Chelette's confidential disclosure by revealing her allegations, and told Finklea that he expected Finklea would be cleared of all allegations.

After his dinner with Finklea and after reporting Mrs. Chelette's allegations to Human Resources, Daniel sent an e-mail to McFadden in Baton Rouge indicating that he intended to give Mrs. Chelette a "Needs Improvement" rating with an 1% increase. There is no dispute that Finklea had input into Mrs. Chelette's performance evaluation, particularly given the fact that he was the highest ranking member of the AFO who was physically located in Monroe. Ultimately, on May 8, 2004, Mrs. Chelette's performance evaluation was finalized, and she was given a lower performance evaluation than she had ever received, along with a 2% increase.

Given these facts, it is reasonable that a jury might reach different conclusions regarding the evidence presented by Plaintiffs and State Farm. *See Gee*, 289 F.3d at 348 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-148 (2000)("a fact finder may infer the ultimate fact of retaliation from the falsity of the explanation."); *Levias v. Texas Dept. of Criminal Justice*, 352 F. Supp. 2d 751, 769 (S.D. Tex. 2004) (holding that summary judgment is improper when the plaintiff has generated a genuine issue of fact of retaliation). While timing alone is not enough to establish pretext, see *Shannon v. Henderson*, 275 F.3d 42, (5th Cir. 2001)

30

(per curiam), a plaintiff's prima facie case, combined with sufficient evidence that the employer's justification is false, may permit the fact finder to conclude that the defendant unlawfully discriminated. *Reeves*, 530 U.S. at 148.

In contrast, the only evidence that Mrs. Chelette has presented to dispute the legitimacy of State Farm's reason for terminating her securities license is the date on the form. Regardless of when the U-5 form was actually signed and dated by State Farm employee Crystal Grabel, Vanderveen's declaration is undisputed that Mrs. Chelette was placed in U-5 status because she failed to meet her education requirements and had no anticipated date of return in June 2004. Mrs. Chelette does not contend that she could meet the requirements or that she was ready to return, nor does she provide any evidence to suggest that other persons on leaves of absence had been allowed to keep their securities licenses. Accordingly, the Court finds that Mrs. Chelette cannot show that State Farm's reasons for terminating her securities license were pretext for retaliation.

For these reasons, the Court finds that Plaintiffs have raised a genuine issue of material fact for trial on whether the reasons given for Mrs. Chelette's negative performance were pretextual, but has failed to create a genuine issue of material fact as to whether State Farm's reasons for terminating her securities license were pretextual. Accordingly, State Farm's Motion for Summary Judgment on Mrs. Chelette's Title VII retaliation claim is GRANTED on the issue of the termination of her securities license, but DENIED on the issue of her negative performance review.

## 2. State Law

In a footnote in its Motion for Summary Judgment, State Farm contends that Mrs. Chelette cannot assert a claim of retaliation under the LEDL because that law does not provide for a cause

31

of action for retaliation in the context of sex discrimination or harassment.[13] Although Plaintiffs have filed memoranda in opposition to State Farm's Motion for Summary Judgment, they never argued that State Farm's contention is incorrect or otherwise raised any issues regarding a state law claim of retaliation.

However, in the pre-trial order and pre-trial memoranda of law, Plaintiffs contend that Mrs. Chelette has properly asserted a claim of retaliation under Louisiana's Whistleblower Statute, La. Rev. Stat. 23:967. State Farm argues that Plaintiffs are improperly attempting to amend the pleadings to add a claim that was never previously asserted and that is not supported by the factual allegations in the Petition or Amended Complaint.

Plaintiffs contend that they are not seeking to amend their pleadings because Mrs. Chelette properly asserted a claim of retaliation under state law in Plaintiffs' original Petition and that they were not required to specifically cite La. Rev. Stat. 23:967.

Following the pretrial conference, the parties provided additional memoranda on this issue. The Court has considered the pre-trial memoranda and the supplemental memoranda and finds that it is appropriate to address the issue in this Ruling. *See* [Doc. Nos. 98, 100, 121, 124].

Louisiana Revised Statute Annotated § 23:967 provides in pertinent part:

A.    An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:

    (1)    Discloses or threatens to disclose a workplace act or practice that is in violation of state law.

    (2)    Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.

---

[13]*See Sawyer v. JRL Enter., Inc.*, No. Civ. A. 05-1685, 2005 WL 3543738 (E.D. La. Oct. 5, 2005); *Lowry v. Dresser, Inc.*, 2004-1196 (La. App. 3 Cir. 2/2/05), 893 So.2d 966.

(3)     Objects to or refuses to participate in an employment act or practice
        that is in violation of law.

La. Rev. Stat. 23:967(C)(1).

The Louisiana First, Fourth, and Fifth Circuit Courts of Appeal have concluded that the

language of the statute and its legislative history have all held that a cause of action under La. Rev.

Stat. 23:967 requires a plaintiff to prove that she complained about an actual violation of state law.

*Accardo v. Louisiana Health Servs. & Indem. Co.*, 2005-2377 (La. App. 1 Cir. 6/21/06), –So.2d –;

*Puig v. Greater New Orleans Expressway Comm'n*, 2000-924 (La. App. 5 Cir. 2000), 772 So.2d

842, *writ denied*, 2003-3531 (La. 3/9/01), 786 So.2d 731; *Hale v. Touro Infirmary*, 2004-0003 (La.

App. 4 Cir. 11/3/04), 886 So.2d 1210, 1214, *writ denied*, 2005-0103 (La. 3/24/05), 896 So.2d

1036.

Although the issue directly before the Court is whether Plaintiffs placed State Farm on

notice that they intended to assert a retaliation claim under the Whistleblower Statute, the Court

finds that it need not engage in this analysis. Even if Plaintiffs' Petition sufficiently apprised State

Farm of the whistleblower claim, the only asserted "actual violation" of state statute at issue is the

violation of the LEDL's prohibition against sexual harassment. *See* [Doc. No. 124, p. 2 (citing

paragraphs 40, 42, 48 and 49 of the Petition and alleging retaliation on the basis of Mrs. Chelette's

complaints about Finklea)]. Having found that Mrs. Chelette's sexual harassment claim fails as a

matter of law, the Court finds that she, likewise, cannot recover under La. Rev. Stat. 23:967.

Accordingly, Plaintiffs are not permitted to proceed to trial with Mrs. Chelette's claims

under La. Rev. State. 23:967.

**D.     Loss of Consortium**

State Farm also moves for summary judgment on Plaintiff Dale Chelette's loss of

33

consortium claim because it is derivative of Mrs. Chelette's state claims. *See Ferrell v. Fireman's Fund Ins. Co.*, 696 So.2d 569 (La. 1997) ("Loss of consortium claims are derivative of primary victim's injuries"). Further, no cause of action for loss of consortium is available under Title VII. *See Edsall v. Assumption Coll.*, 367 F. Supp.2d 72, 85 (D. Mass. 2005) (injured party's spouse cannot assert loss of consortium under 42 U.S.C. § 1981 or Title VII).

Having found that Mrs. Chelette's state law claims fail as a matter of law, State Farm's Motion for Summary Judgment on Plaintiff Dale Chelette's loss of consortium claim is GRANTED.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. No. 58] is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to all claims against Defendant State Farm Fire and Casualty Company, and the asserted claims are DISMISSED WITH PREJUDICE.

The motion is also GRANTED as to Plaintiff Vicky B. Chelette's Title VII and state law claims of sexual harassment and as to Plaintiff Dale Chelette's loss of consortium claim.

However, the motion is GRANTED IN PART and DENIED IN PART as to Plaintiff Vicky B. Chelette's Title VII retaliation claim. Mrs. Chelette will be permitted to proceed to trial with the retaliation claim on the basis of her negative performance review, but not on the basis of the termination of her securities license.

Finally, to the extent that Plaintiffs contend that they properly asserted a claim under the Louisiana Whistleblower Statute, the Court finds that it need not address that issue because any

34

such claim would fail on the basis that it has found no violation of any state law. Therefore,

Plaintiffs are not permitted to proceed to trial on a claim under this statute.

MONROE, LOUISIANA, this ___ 28 ___ day of ___ August ___, 2006.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE